KNITZ, APPELLANT, v.
MINSTER MACHINE COMPANY, APPELLEE.

[Cite as Knitz v. Minster Machine Co. (1982),
69 Ohio St. 2d 460.]

(No. 81-256—Decided February 26, 1982.)

*Green, Lackey, Nusbaum, Phillips & Harris Co., L.P.A.,* and *Mr. John A. Harris, III,* for appellant.

*Messrs. Shumaker, Loop & Kendrick, Mr. Robert M. Anspach* and *Mr. Timothy C. McCarthy,* for appellee.

WILLIAM B. BROWN, J.    The case presents us with the question of whether a motion for summary judgment pursuant to Civ. R. 56 should have been granted to appellee. Before considering that issue, however, it is necessary to review first the proper legal standard to be applied to cases alleging a design defect in a manufactured product which causes injury.

## I.

Both parties assert that *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, is dispositive of this case. In *Temple,* the plaintiff was injured while operating a punch press when a number of aluminum extrusions fell from the bolster plate onto the dual operating buttons. This caused the press ram to close on her arms. The ram tripping device had been altered, however, by the plaintiff's employer. Specifically, the employer relaced the original shoulder level tripping buttons with buttons waist high. The plaintiff brought an action under,

---

[1] Appellant also alleged negligence on the part of appellee in the following acts:

"(a) failure to design, properly and adequately said press;

"(b) failure to inspect, properly and adequately said press;

"(c) failure to test properly and adequately said press;

"(d) failure to manufacture properly and adequately said press;

"(e) failure to install or to incorporate known safety devices on said press;

"(f) failure to provide adequate and proper warnings and instructions regarding the dangers of said press."

Appellant's claims in negligence were subsequently dropped and are not considered in this appeal.

Appellant additionally raises upon appeal an argument regarding failure to warn of product defect which is considered at footnote 5, *infra.*

*inter alia,* a theory of strict liability in tort. We affirmed the granting of summary judgment for all defendants.

In *Temple,* we adopted Section 402A of the Restatement of Torts 2d and its comments "[b]ecause there are virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort. * * * " *Temple, supra,* at page 322. Moreover, the Restatement formulation of strict liability in tort "greatly facilitates analysis in this area." *Id.* Thus, Section 402A of the Restatement of Torts was adopted as a conceptual overlay upon the broader definition of strict liability in tort announced in *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, 237: "For the plaintiff to recover, he must prove, by the required degree of proof, that the joists were defective, that they were defective at the time the manufacturer sold them, that the defect caused them to collapse while they were being used for their ordinary intended purpose, and that the defect was the direct and proximate cause of the plaintiff's injury, and that the plaintiff's presence was in a place which the defendant could reasonably anticipate." See, also, *State Auto Mutual Ins. Co.* v. *Chrysler Corp.* (1973), 36 Ohio St. 2d 151.

Applying Section 402A(1)(b) to the facts, we held that the alteration of the press by the plaintiff's employer precluded a finding of strict liability against the manufacturer of a defective product because the press did not reach "the user or consumer without substantial change in the condition in which it is sold." It is clear that our holding in *Temple* on the manufacturing defect issue was based upon the evidence of substantial changes in the condition of the press made subsequent to the purchase.

We also held that the plaintiff did not present a genuine issue of material fact on the question of negligent design of the press. Appellee argues strenuously that *Temple* applied equally to a claim of strict liability design defect as well as negligent design defect and that compliance with the Ohio Industrial Safety Code is a defense to a strict liability claim. This was not the obvious intent of *Temple.* Part III of the opinion, in which the design defect claim is considered, is concerned solely with the issues of defendants' liability for negligence in failing to warn of a dangerous propensity of a product and whether

"Wean *negligently* designed the power press." (Emphasis added.) *Temple,* at pages 325-326. The standard applied, then, was one appropriate to the law of negligence: " ' * * * [i]t is the duty of a manufacturer to use *reasonable care* under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended. * * * [Citation omitted.]' " *Id.,* at page 326. As a guide in "passing judgment upon the *reasonableness* of a manufacturer's conscious design choice," (emphasis added), *id.,* we looked to statutory regulation, in particular, the Industrial Commission Safety Code.

*Temple, supra,* did not, therefore, provide a legal standard for the application of strict liability in tort to design defects. We turned to that task in *Leichtamer* v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456.

In *Leichtamer* we reviewed the policy underlying the development of strict liability in tort and concluded that application of a varying tort standard based upon "[a] distinction between defects resulting from manufacturing process and those resulting from design, and a resultant difference in the burden of proof on the injured party, would only provoke needless questions of defect classification, which would add little to the resolution of the underlying claims. A consumer injured by an unreasonably dangerous design should have the same benefit of freedom from proving fault provided by Section 402A as the consumer injured by a defectively manufactured product which proves unreasonably dangerous." *Id.,* at page 464.

The focus of the inquiry in *Leichtamer* was what constituted a "defective condition unreasonably dangerous"[2] as

---

[2] The Restatement formulation of strict liability in tort has come under considerable criticism for appearing to impose a dual requirement that an injured plaintiff prove that a product is both "defective" and "unreasonably dangerous." See, *e.g.* Beasley, Products Liability and the Unreasonably Dangerous Requirement, pages 57-94. To require an injured plaintiff to prove both that a product contained a defect and that the defect rendered the product "unreasonably dangerous" would place a greater requirement upon him than required by our initial formulation of strict liability in tort announced in *Lonzrick* v. *Republic Steel Corp., supra.* Moreover, the examples in Comment *i* to Section 402 A of the Restatement make clear that the unreasonably dangerous terminology was adopted by the American Law Institute to distinguish defective products from those foods or drugs which necessarily involve some risk of

formulated by Section 402A of the Restatement of Torts. We adopted a variation of the familiar "consumer expectation test" of Comment *i* to Section 402: "A product is in a defective condition unreasonably dangerous to the user or consumer if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Leichtamer,* paragraph two of the syllabus. This standard followed as a logical development from commercial warranty origins of strict liability in tort. See *Lonzrick* v. *Republic Steel Corp., supra,* at page 235; *Temple* v. *Wean United, supra,* at pages 320-321. It reflected "the commercial reality that '[i]mplicit in * * * [a product's] presence on the market * * * [is] a representation that it [will] safely do the jobs for which it was built.' *Greenman* v. *Yuba Power Products* [citation omitted]." *Id.,* at page 466.

Unlike the factual setting in *Leichtamer,*[3] there are situations in which "the consumer would not know what to expect, because he would have no idea how safe the product could be made." Wade, On the Nature of Strict Tort Liability for Products, 44 Miss. L.J. 825, 829. See, also, Keeton, Products Liability—Liability Without Fault and the Requirement of a Defect, 41 Tex. L. Rev. 855, at page 861. Such is the case *sub judice.* Difficulty could arise, for example, where the injured party is an innocent bystander who is ignorant of the product and has no expectation of its safety, or where a new product is involved and no expectation of safety has developed. Conversely, liability could be barred hypothetically where industrial workmen "gradually learn of the dangers involved in the machinery they must use to make a living and come to 'expect' the dangers." Beasley, Products Liability and the Unreasonably Dangerous Requirement, pages 88-89. In such cases, the policy underlying strict liability in tort,[4] requires that "a

---

harm, if only from over consumption (such as sugar is dangerous to a diabetic). Accordingly, we focus our inquiry on the nature of "defect" and dispense with any requirement for strict liability in tort that a defect be unreasonably dangerous.

[3] In *Leichtamer,* the plaintiffs were injured while riding in a Jeep Model CJ-7 on an off-the-road course. The vehicle had overturned and its rollbar failed to provide any protection to the passengers. The plaintiffs adduced evidence that the defendant designer-manufacturer had advertised the vehicle as safe for off-the-road use, thus creating an expectation in the users of the vehicle.

[4] " * * * the policy underlying the doctrine [is] that the public interest in human

product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." *Barker* v. *Lull Engineering Co.* (1978), 20 Cal. 3d 413, 430, 573 P. 2d 443.

Accordingly, we hold that a product design is in a defective condition to the user or consumer if (1) it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the benefits of the challenged design do not outweigh the risk inherent in such design. Factors relevant to the evaluation of the defectiveness of the product design are the likelihood that the product design will cause injury, the gravity of the danger posed, and the mechanical and economic feasibility of an improved design. Cf. *Barker* v. *Lull Engineering Co., supra,* at page 431; *Phillips* v. *Kimwood Machine Co.* (1974), 269 Ore. 485, 525 P. 2d 1033; and Wade, On the Nature of Strict Tort Liability for Products, *supra,* at pages 837-838.[5]

## II.

Civ. R. 56(C) provides that summary judgment shall be rendered if there is no genuine issue as to any material fact; if the moving party is entitled to judgment as a matter of law; and if it appears from the evidence that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is

---

life and safety can best be protected by subjecting manufacturers of defective products to strict liability in tort when the products cause harm." *Leichtamer, supra,* at pages 464-465.

[5] Appellant also offers the proposition that "the failure to give adequate warnings gives rise to a cause of action in strict liability." As we pointed out in *Temple,* at page 325, "[i]t is * * * apparent that the rule imposing obligation on the manufacturer or seller to give suitable warning of a dangerous propensity of a product is a rule fixing a standard of care, and any tort result from the failure to meet this duty is, in essence, a negligent act." Appellant, however, abandoned his claim in negligence.

Moreover, we held in *Leichtamer,* at page 469, that "[t]he absence of a warning does not, without more, provide a basis for [strict] liability; rather, evidence of warning is in the nature of an affirmative defense to a claim that a product is unreasonably dangerous."

made, such party being entitled to have the evidence construed most strongly in his favor.

Applying this standard to both the facts of record and to the principles of strict liability in tort discussed, *supra,* we conclude that appellant has made out genuine issues of fact of whether appellee's press design was defective by allowing accidental tripping of the foot pedal control and in failing to provide a point of operation guard when the foot pedal is operative. Specifically, appellant provided an affidavit of James J. McCarthy, a former safety engineer for General Motors Corporation, involved with analysis of machine accident potential. McCarthy's affidavit states, *inter alia,* that in his opinion the press is defective "because of inadequate guarding at the point of operation caused by failure to attach a barrier or interlock gate guard to prevent entry of the operator's hands into the danger area while the ram is descending * * * the press is defective because of inadequate guarding of the foot pedal of the foot switch to prevent inadvertent entry and tripping."

Appellant also offered the deposition of Simon Tammy, a mechanical engineer, in which he testified that the foot switch creates unique hazards which should be prevented by use of a point of operation guard. Appellant's own deposition indicates the accident occurred when she was attempting to pull the foot switch toward her by use of her foot, but that she was not intentionally attempting to activate the foot switch.

Construing this evidence most strongly in favor of appellant, we hold that reasonable minds cannot come to but one conclusion on the defectiveness of the design of the foot switch and the absence of a point of operation guard. Accordingly, for the foregoing reasons, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

CELEBREZZE, C. J., LOCHER and MCCORMAC, JJ., concur.

SWEENEY, HOLMES and KRUPANSKY, JJ., dissent.

MCCORMAC, J., of the Tenth Appellate District, sitting for C. BROWN.

HOLMES, J., dissenting.

I respectfully dissent.    I continue to adhere to my posi-

tion, articulated in my dissent in *Leichtamer* v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456, 477, that a manufacturer may not be held liable for the defective design of a product in the absence of a showing that the manufacturer was negligent in the design of the product.[6] Nevertheless, in my opinion, there is no basis for imposing liability here, regardless of what standard is applied.

It is uncontroverted that the press that injured the appellant was fitted with hold-back guards which were designed to assure that the operator's hands and arms were out of the die area when the ram descended. The manufacturer produced this type of press with variable points of operation. The press could be obtained with two hand surface operating buttons, or a foot operable model which comes supplied with hand and arm hold-back guards. The employing company here selected the latter type of equipment. The appellant was instructed in the proper use of the guards and repeatedly warned not to place her hands in the press area without using the hold-back guards, yet appellant was injured when she put her hands in the press without using the guards. Had appellant followed the instructions and warnings, this unfortunate accident would not have occurred.

In my view, reasonable minds could come to but one conclusion: the press was not in a defective condition. Where a press, such as the one here, is equipped with safety devices which are sufficient to protect the operator—if used—and the operator is informed about the devices, I would hold that as a matter of law the press is not defective.

The majority opinion would render the manufacturer of any machinery absolutely liable for any and all injuries received by the user however careful the company may be in the design of the product and however careless the individual might be in the use thereof. This should not be the law.

Accordingly, I would affirm the judgment of the Court of Appeals.

SWEENEY and KRUPANSKY, JJ., concur in the foregoing dissenting opinion.

---

[6] Clearly, under negligence principles, this court's holding in *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, would preclude finding the appellee liable.

KRUPANSKY, J., dissenting. I agree with the finding of the courts below that the punch press at issue contains no design defect as a matter of law. Accordingly, I must respectfully dissent from this court's decision reversing the summary judgment rendered in the defendant's favor.

This court stated in *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, at 321:

"It is now well established that, in order for a party to recover based upon a strict liability in tort theory, it must be proven that: '(1) There was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss.' *State Auto Mutual Ins. Co.* v. *Chrysler Corp.* (1973), 36 Ohio St. 2d 151."

There are several reasons I do not feel the plaintiff has fulfilled the three provisions set forth in *Temple*. Firstly, the machine involved herein was equipped with a two-hand, button-tripping device which Ohio Industrial Commission Regulation IC-5-08.03(B)(1)(c) sanctions as an acceptable means of guarding a power press.[7] The significance of complying with Industrial Commission Regulations was established in *Temple* where we stated at page 327:

"In view of this regulation [IC-5-08.03], which specifies

---

[7] Ohio Industrial Commission Regulation IC-5-08.03, dealing with power presses, reads in relevant part:

"(A) GUARDING

"(1) Construction

"Every power press in use shall be constructed, or shall be guarded to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle.

"(B) ACCEPTABLE METHODS OF GUARDING

"(1) Manual Feed Presses, by:

"(a) Gate Guard

"(b) Fixed Barrier Guard

"(c) Sweep Guard

"(d) Pull and Restraint or Hold-back Guard

"(e) Two-Hand Tripping Device

"(f) Limitation of ram stroke

"(g) Electronic Guard

"(h) Photoelectric or Selenium Guard

"(i) Magnetic Guard

"(j) Use of Special Tools"

that either a fixed barrier guard or a two-hand tripping device (with which this press was equipped) are acceptable methods of guarding, this court holds that the question of whether or not the manufacturer was negligent in not providing fixed barrier guards should be answered, *as a matter of law,* in the negative." (Emphasis added.)

Admittedly, *Temple* dealt with compliance under Industrial Commission Regulations in the context of a negligence action, however, the underlying premise should not change simply because the cause of action is phrased in terms of strict liability, as opposed to negligence. The Ohio Industrial Commission has been granted the authority to promulgate safety standards for the various industries. A manufacturer who fully complies with these standards in designating and constructing his products should be secure that his product is of reasonable design as a matter of law, thus insulating him from liability for design defects. The Industrial Commission Regulations should create safeguards not only for consumers and employees, but for manufacturers as well.

Notwithstanding the defendant's compliance with IC-5-08.03, the plaintiff asserts this press was defective because the machine as shipped included a foot pedal which rendered the two-hand, button-tripping device inoperable. I do not agree with plaintiff that defendant's addition of a foot pedal *at the request of plaintiff's employer* rendered this machine defective. Furthermore, even if the two-hand, button-tripping device in combination with the foot pedal could be characterized as a "defect," still the punch press itself is not "defective" due to the pull and restraint or hold-back guard, an additional safety device, which was affixed to the machine at the time of plaintiff's accident. The pull and restraint or hold-back guard is another "acceptable method of guarding" a manual feed press within Industrial Commission Safety Code IC-5-08.03. Therefore, even assuming the press was "defective" prior to the addition of the pull and restraint or hold-back guard, subsequent to its addition the machine could no longer be deemed defective. Moreover, whether this safety device was added by the defendant or by the plaintiff's employer is immaterial. The relevant determination is whether the machine was defective at the time of plaintiff's injury, for if no

defect existed at this time then clearly the accident did not result from a defect in the press.

At the time of this accident the plaintiff was not wearing the pull and restraint or hold-back guard provided. Plaintiff's witnesses indicated this injury would never have occurred had the plaintiff been wearing this safety device as instructed. Consequently, it was plaintiff's failure to wear the available safety device which was the sole cause of her injury, and not any defect in the punch press which she was operating.

In sum, I feel as a matter of law the design of the manual feed press used by the plaintiff was not defective at the time of sale, nor was it defective at the time of plaintiff's injury. Accordingly, I would have affirmed the judgment of the Court of Appeals.